In re **HARRY TURNER AND ASSOCIATES, INC., Debtor.**

**HARRY TURNER AND ASSOC., INC., Plaintiff,**

Merchants National Bank, Intervenor,

v.

**SHAWNEE COUNTY, KANSAS, Defendant.**

Bankruptcy No. 92–40552–7C.
Adv. No. 92–7609.

United States Bankruptcy Court,
D. Kansas.

April 20, 1993.

Mark Shaiken, Stinson, Mag & Fizzell, Kansas City, MO, for Merchants Nat. Bank.

Russell Wright, Asst. Shawnee County Atty., Topeka, KS, for Shawnee County, Kan.

Joseph I. Wittmam, Chapter 7 Trustee, Topeka, KS, for debtor.

Charles N. Henson, Wright, Henson, Somers, Sebelius, Clark & Baker, Topeka, KS, for the Kansas Bankers Ass'n.

John Foulston, Asst. U.S. Trustee, Wichita, KS.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Chief Judge.

The debtor commenced this proceeding before its bankruptcy case was converted from chapter 11 to chapter 7. Merchants National Bank (MNB) intervened, seeking to have its mortgage declared superior to tax liens claimed by Shawnee County, Kansas. The proceeding is presently before the Court on MNB's motion for summary judgment. The parties have submitted statements of uncontroverted facts and legal memoranda. The Court has allowed the Kansas Bankers Association to file an amicus brief.

MNB is represented by Mark Shaiken of Stinson, Mag & Fizzell. Shawnee County, Kansas (County), is represented by Assistant Shawnee County Counselor Russell Wright. The debtor, Harry Turner and Associates, Inc. (HTA), is now represented by Joe Wittman, the chapter 7 trustee, although it does not appear that the trustee has indicated whether he intends to pursue the relief originally sought by the debtor. The Kansas Bankers Association (KBA) is represented by Charles N. Henson of Wright, Henson, Somers, Sebelius, Clark & Baker.

Argument was made to the Court on January 11, 1993, and the motion is ready for decision.

## FACTS

*A. Uncontroverted Facts*

The following facts are not disputed by the parties, and are drawn from MNB's Statement of Uncontroverted Facts, following the paragraph numbering used there.

1. In 1986, HTA wanted to purchase certain real property in Topeka, Kansas, known as 1515 N.W. Saline (the Real Property), on which to construct a new facility for its operations (the Facility).

2. In order to acquire the Real Property and to construct the Facility, HTA sought financing from MNB.

3. In conjunction with seeking the financing, HTA informed MNB that HTA was seeking to establish the Real Property as exempt from real estate taxes pursuant to Article 11, § 13 of the Kansas Constitution.

4. MNB was interested that HTA obtain an exemption because MNB believed HTA's projected cash flow might not be sufficient to service real estate taxes, and because Harry M. Turner, Jr. (Turner), president and principal shareholder of HTA, informed MNB that HTA was eligible for and could obtain an exemption under Kansas law.

5. In September, 1986, MNB agreed to advance $2.6 million (the Financing) to HTA to acquire the Real Property and to construct the Facility.

. . . .

7. The Financing was secured by, among other things, a valid and perfected real estate mortgage (the Mortgage) on the Real Property. The Mortgage was properly recorded on September 11, 1986, in the Office of the Shawnee County, Kansas, Register of Deeds.

8. At the time the Mortgage was recorded, the mortgage registration tax was fully paid.

9. In conjunction with the Financing, MNB obtained a title report (the 1986 Title Report) showing that as of September 11, 1986, no real property taxes were owed on the Real Property.

10. Utilizing the Financing, HTA constructed the Facility, and began operations there late in 1986.

11. Between September 25, 1987, and May 30, 1991, HTA executed the following promissory notes (the Notes) in favor of MNB:

| Note # | Amount | Date of Note | Maturity Date |
|---|---|---|---|
| 85947 | $ 425,000.00 | 05/30/91 | 05/30/92 |
| 85404 | $ 75,500.00 | 07/20/90 | 07/20/95 |
| 85280 | $ 75,000.00 | 05/04/90 | 05/04/95 |
| 85066 | $ 100,000.00 | 02/15/91 | 02/15/96 |
| 85061 | $ 79,472.66 | 02/09/90 | 01/31/95 |
| 84273 | $ 166,150.00 | 10/21/88 | 11/21/93 |
| 83661 | $ 83,141.40 | 12/09/87 | 12/09/92 |
| 83544 | $2,100,000.00 | 09/25/87 | 09/25/90 |
| 83394 | $ 238,000.00 | 07/13/87 | 07/13/92 |
| 83115 | $ 128,600.00 | 02/20/87 | 02/20/92 |

12. Between September 1987 and December 1991, MNB contacted the Shawnee County Treasurer to confirm that the Real Property was tax exempt and that no taxes were owed on it. MNB made a contemporaneous written log (the Log) of the contacts, memorializing the information provided by the County. Each time MNB contacted the Shawnee County Treasurer, MNB presented the Log to the Treasurer and the Treasurer examined the real property records, completed the Log to indicate that no real property taxes were owed, and signed the Log and returned it to MNB. Thus, the County specifically and expressly informed MNB that no taxes were owed on the Real Property and that the Real Property was tax exempt.

13. The purposes of these contacts were, among other things, as follows:

a. Based on its concerns regarding HTA's cash flow, MNB sought to confirm that HTA's financial condition, as HTA reported it to MNB, was accurate and sound.

b. Since MNB believed the Real Property was tax exempt, MNB did not require a tax escrow account, as it would in any normal real estate loan transaction. MNB sought information regarding tax exempt status to assist it in determining whether it was still appropriate not to require a tax escrow account.

c. MNB sought to ensure that no taxes were owed. If taxes had been owed, MNB would have immediately insisted that HTA pay them. Thus, if MNB had been informed that taxes were owed, no more than one year of taxes would ever have accrued.

d. MNB sought to determine the tax exempt status to aid it in its decision whether to renew certain of the Notes.

14. On February 27, 1989, the Shawnee County Appraiser issued a "Change of Value Notice" for the 1989 tax year (the 1989 Notice).

15. The 1989 Notice listed the Real Property as "Class EM," meaning that the Real Property was tax exempt.

16. On April 13, 1990, the Shawnee County Appraiser issued a "Notice of Property Valuation" for the Real Property for the 1990 tax year (the 1990 Notice).

17. The 1990 Notice listed the Real Property as "Class EM," meaning that the Real Property was tax exempt.

18. On April 15, 1991, the Shawnee County Appraiser issued a "Notice of Property Valuation" for the Real Property for the 1991 tax year (the 1991 Notice).

19. The 1991 Notice listed the Real Property as "Class EM," meaning that the Real Property was tax exempt.

. . . .

23. In reliance on the County's representations referred to in paragraphs 12–19, MNB renewed certain of the Notes described in paragraph 11, did not require a tax escrow account, and was unable to insist that HTA timely pay any of the taxes the County now claims are owed.

24. On February 26, 1992, MNB obtained a title report for the Real Property (the February 1992 Title Report).

25. The February 992 Title Report indicates that the County listed the Real Property as tax exempt as of the date of the report.

26. On March 6, 1992, MNB filed suit in the District Court of Shawnee County, Kansas, Case No. 92–CV343 (the Shawnee County Suit), against HTA, the County, and the Topeka/Shawnee County Development Corporation to commence, among other things, foreclosure of its mortgage on the Real Property.

27. The Court takes judicial notice that on March 19, 1992 (the Filing Date), HTA filed a voluntary Chapter 11 bankruptcy case (the Case) before this Court.

. . . .

29. On March 25, 1992, six days after the Filing Date, the County sent HTA tax bills seeking payment of property taxes purportedly due for the years 1988 to 1991 (the 1992 Tax Bills).

30. The 1992 Tax Bills sought $35,941.65 for 1988, $100,525.36 for 1989, $98,231.14 for 1990, and $96,369.66 for 1991.

31. The Court takes judicial notice that the County has never filed a motion for relief from the automatic stay in the Case, and consequently had not obtained stay relief before sending HTA the 1992 Tax Bills.

32. The Court also takes judicial notice that on March 23, 1992, MNB filed a Motion for Relief From the Automatic Stay (the Lift Stay Motion) in the Case seeking leave, among other things, to foreclose its Mortgage on the Real Property.

33. On April 13, 1992, a hearing was held respecting the Lift Stay Motion, and on April 14, 1992, this Court entered an order (the Lift Stay Order) granting MNB relief from the automatic stay, allowing MNB, among other things, to proceed with foreclosure of its Mortgage on the Real Property.

34. On August 18, 1992, an agreed Journal Entry of Foreclosure (the Journal Entry) was entered in the Shawnee County Suit. The County agreed to the Journal Entry.

35. Pursuant to the Journal Entry, an Order of Sale was issued ordering the Sheriff of Shawnee County, Kansas, to sell the Real Property.

36. On September 4, 1992, MNB obtained a title report for the Real Property (the September 4, 1992, Title Report) which indicates that the Real Property was tax exempt as of the date of the report.

37. On September 22, 1992, MNB bought the Real Property at the foreclosure sale for a credit bid of $1.6 million. As agreed in the Journal Entry, MNB deposited $330,423.51 in an escrow account (the Disputed Tax Account Funds) and the County released its lien on the Real Property.

38. The County and MNB agreed that this Court should decide, among other things, whether Shawnee County has a lien that is prior to MNB's mortgage lien on the Real Property. If the County's lien is not prior to MNB's mortgage lien, MNB is entitled to the Disputed Tax Account Funds.

### B. Allegedly Controverted Facts

The County attempted to controvert the suggested uncontroverted facts in paragraphs 6, 20, 21, 22 and 28 of MNB's memorandum. The Court finds as follows with respect to each paragraph:

6. MNB asserted: "In conjunction with the Financing, Turner informed MNB that HTA had obtained the Exemption." The County responds that no exemption from ad valorem taxes was granted and that the statement is inadmissible hearsay. The Court finds from the other uncontroverted facts, the documents submitted, and the statements of counsel at the hearing that it is uncontested that MNB believed from the records available to it that the Real Property was exempt from ad valorem taxes.

20. The facts asserted in this paragraph are not necessary to this decision.

21. MNB asserted: "On February 5, 1992, HTA sought to establish that it had obtained the Exemption in 1986 by filing an application before the Kansas Board of Tax Appeals (BOTA)." The County as-

serts that the statement is inadmissible hearsay. The Court finds that documents the County itself submitted as exhibits to its memorandum, to which neither HTA nor MNB objected, demonstrate that MNB's assertion is true.

22. MNB asserted: "As of February 5, 1992, when HTA filed its BOTA application, to the best of MNB's knowledge, HTA had not received any notice that the Real Property's tax exempt status was changed, nor had HTA received any Shawnee County real estate tax bills for the years 1988–1991." The County states the assertion is inadmissible as not within MNB's personal knowledge. The Court again finds that documents the County itself submitted as exhibits to its memorandum, to which neither HTA nor MNB objected, demonstrate that MNB's assertion is true. According to the County, the Real Property's exempt status on its records was not changed until mid-March of 1992 and the tax bills were not sent until the change was made.

28. The County recited its own version of the information contained in MNB's paragraph 28, and attached exhibits in support of its assertions. No one has questioned the County's assertions except its claim that the Real Property's exempt classification was erroneous. The Court concludes the following facts pertaining to MNB's paragraph 28 are uncontroverted:

> The County assessed the Real Property for ad valorem taxes for the years 1988, 1989, 1990 and 1991. The Real Property was appraised and listed on the tax rolls for each year. The Real Property was classified as exempt during all four years. This classification continued until on or about March 19 or 20, 1992, when the Board of County Commissioners of the County issued correction orders reclassifying the Real Property as nonexempt and subjecting it to ad valorem taxes for the years 1988 through 1991. Thereafter, the County Clerk changed the tax rolls accordingly. The various correction orders recite the reason for change was to correct clerical error. On March 25, 1992, corrected tax statements and copies of the correction orders on the Real Property for the years 1988 through 1991 were sent to the debtor.

*C. Additional Relevant Facts*

Whether or not the exemption from ad valorem taxes on the Real Property was properly granted is not an issue at this time. It is a fact that HTA applied to the City of Topeka for an exemption. After holding hearings, the City took some action on the request which apparently caused the County to list the Real Property as exempt. The exempt classification was included on all the relevant public records that existed at the time MNB took its mortgage and loaned money secured by the Real Property, and that classification remained on the records until March of 1992.

CONTENTIONS OF THE PARTIES

The County contends that certain Kansas statutes authorize it to correct errors in the tax rolls, including erroneously listing property as exempt, and collect taxes which were improperly omitted from those rolls, citing K.S.A. 79–1701, *et seq.*, and K.S.A. 1992 Supp. 79–1475. In addition, it contends that Bankruptcy Code §§ 362(b)(3) and 546(b) allow it to perfect a lien for such taxes after the taxpayer has filed for bankruptcy.

MNB and amicus KBA contend that the Kansas statutes the County relies on do not allow retroactive corrections for HTA's 1988 through 1991 taxes, but that if they do, the County should be equitably estopped from asserting any lien superior to MNB's mortgage. In addition, they contend that the County's attempted postpetition lien perfection violated § 362 and is void.

DISCUSSION AND CONCLUSIONS

As part of its investigation in connection with loaning $2,600,000 to HTA, MNB ascertained from the County's real property records that the County had listed the Real Property—to be mortgaged to MNB as security for part of the loan—as exempt from ad valorem taxes. Relying in part on this exemption, MNB determined that HTA's cash flow and financial condition were such

that the loan could be made. Since the Real Property was listed as exempt from ad valorem taxes, MNB did not require a tax escrow account as it would in an ordinary real estate loan transaction. MNB then loaned HTA the money and took a $2,100,000 mortgage on the Real Property, along with other security.

In September 1986, February 1992, and September 1992, MNB obtained title reports which showed that no real property taxes were owed on the Real Property and that it was exempt from ad valorem taxes. In 1989 and 1990, the County Treasurer's Office verified in writing to MNB that no real property taxes were owed because the property was exempt from ad valorem taxes. On other occasions, MNB directly or through HTA received county documents which indicated that the Real Property was exempt from ad valorem taxes, for example, the 1989 Change of Value Notice issued by the County Appraiser. MNB not only loaned HTA money on numerous occasions but also renewed some of the Notes representing HTA's obligation to MNB relying on its belief, verified by the County's employees and records, that the Real Property was exempt from ad valorem taxes. It was not until after HTA had defaulted on the Notes secured by the Mortgage and filed this chapter 11 proceeding that the County changed the listing of the Real Property from exempt to nonexempt and sent HTA tax bills for the years 1988 through 1991. The County, through its recommending officer and Board of County Commissioners, declared the change was to correct a clerical error in classifying the Real Property. The County further seeks to have its newly asserted tax claims determined to be a first lien on the Real Property ahead of MNB's Mortgage.

During the chapter 11 proceeding, MNB received relief from the automatic stay to foreclose on its Notes and Mortgage. A state court foreclosure judgment was obtained, and MNB credit bid $1,600,000 at the foreclosure sale. As agreed by the parties, MNB placed $330,423.51 of the sale price in escrow to pay the County the full amount of its ad valorem tax claims if they were determined to be valid and payable in advance of MNB's Mortgage. The County

has never sought or obtained relief from the automatic stay to allow it to pursue its claims against the debtor or the bankruptcy estate.

The County relies on the following Kansas statutes to support its purported correction of clerical errors concerning the debtor's real property taxes.

**Duties of county appraiser and clerk regarding property discovered to have been omitted from tax rolls.** Whenever the county appraiser discovers that any real property subject to taxation has been omitted from the tax rolls, such property shall immediately be listed and valued by the appraiser, and returned to the county clerk. The county clerk, upon receipt of the valuation for such property, shall place such property on the tax rolls and compute the amount of tax due based upon the mill levy for the year in which such tax should have been levied, and shall certify such amount to the county treasurer as an added or escaped appraisal....

*K.S.A. 1992 Supp. 79–1475.*

**Correction of clerical errors by county clerk.** The county clerk shall, prior to November 1, correct the following clerical errors in the assessment and tax rolls for the current year, which are discovered prior to such date:

(a) Errors in the description or quantity of real estate listed;

(b) errors in extensions of values or taxes whereby a taxpayer is charged with unjust taxes;

(c) errors which have caused improvements to be assessed upon real estate when no such improvements were in existence;

(d) errors whereby improvements located upon one tract or lot of real estate have been assessed as being upon another tract or lot;

(e) errors whereby taxes have been charged upon property which the state board of tax appeals has specifically declared to be exempt from taxation under the constitution or laws of the state;

(f) errors whereby the taxpayer has been assessed twice in the same year

for the same property in one or more taxing districts in the county;

(g) errors whereby the assessment of either real or personal property has been assigned to a taxing district in which the property did not have its taxable situs; and

(h) errors whereby the values or taxes are understated or overstated as a result of a mistake on the part of the county.

*K.S.A. 79–1701.*

**Correction of clerical errors by board of county commissioners; refund, cancellation or credit of overpayments of taxes based on errors.** Any taxpayer, the county appraiser or the county clerk shall, on their own motion, request the board of county commissioners to order the correction of the clerical errors in the appraisal, assessment or tax rolls as described in K.S.A. 79–1701, and amendments thereto. The board of county commissioners of the several counties are hereby authorized to order the correction of the clerical errors specified in K.S.A. 79–1701, and amendments thereto, in the appraisal, assessment or tax rolls for the current year and the immediately preceding two years during the period on and after November 1 of each year.... In the event the error results in an understatement of value or taxes as a result of a mistake on the part of the county, the board of county commissioners of the several counties are hereby authorized to correct such error and order an additional assessment or tax bill, or both, to be issued, except that, in no such case shall the taxpayer be assessed interest or penalties on any tax which may be assessed. If such error applies to property which has been sold or otherwise transferred subsequent to the time the error was made, no such additional assessment or tax bill shall be issued.

*K.S.A. 79–1701a.*[1]

■ The Kansas Supreme Court stated in *In Re Order of Board of Tax Appeals,*

236 Kan. 406, 412, 691 P.2d 394 (1984), "We have held that tax laws are statutory and do not exist apart from the statute. [Citation omitted.] As such, they must be strictly construed." *See also Masson, Inc. v. County Assessor of Wyandotte County,* 222 Kan. 581, 567 P.2d 839 (1977). Consequently, taxing authorities are sometimes left without a method for correcting errors. *See Order of Board of Tax Appeals,* 236 Kan. at 413.

■ While the assessments delivered to the debtor make clear that the County relied on K.S.A. 1992 Supp. 79–1475 to justify the changes, the stipulated facts make clear that 79–1475 does not apply to this situation. That provision appears to allow a county to correct assessments for any number of prior years, as the County did here for 1988 through 1991, while K.S.A. 79–1701a allows corrections only for the current and two immediately preceding years, here limited to 1990, 1991, and 1992 since the changes were made after November 1, 1991. Thus, the County must have relied on 79–1475. However, the Real Property was appraised and was not omitted from the tax rolls from 1988 through 1991. The County's records show, and it admits in its memorandum, that the Real Property was appraised and included on the tax rolls in each of the years in question. Since 79–1475 establishes procedures for added or escaped appraisals only when property has been omitted from the tax rolls, application of the statute here was inappropriate. *See Order of Board of Tax Appeals,* 236 Kan. at 410–11.

■ Though it appears the County did not act under K.S.A. 79–1701 and –1701a to correct clerical errors by the county clerk, the County did cite those statutes in its memorandum. Possible corrections under 79–1701a are limited to those specified in 79–1701. Section 79–1701 describes eight specific clerical errors in the assessment and tax rolls which may be corrected. None of the specified errors is clearly present in this case, though an argument of sorts may be made for the eighth error,

1. Although the Court will rest its decision on other grounds and not expressly consider MNB's equitable estoppel theory, the Court notes the last sentence of 79–1701a in essence incorporates the theory for certain situations.

that is, an understating or overstating of the values or taxes as a result of a mistake by the County. In its brief, the amicus KBA contends that listing property as exempt so no taxes are due is not an understatement of the taxes. During oral argument, the County tended to agree with this position. If the County indeed conceded this point, then none of the statutes cited authorized the County to correct the allegedly erroneous exemption of the Real Property and assess back taxes against it. Even if this lack of authority resulted from legislative oversight rather than deliberate omission, such a state of affairs is not unheard of and, at least where tax laws are concerned, is one which must be remedied by the legislature, not the courts. *See Order of Board of Tax Appeals,* 236 Kan. at 413.

Assuming, on the other hand, that the County did not concede the scope of 79–1701(h) is so limited and that the word "understated" could be interpreted so broadly as to include a situation where the assessment declared zero taxes to be due, the language of 79–1701a still presents several problems for the County. The first is that the statute allows corrections only for the current tax year and the two immediately preceding years; thus, the County would have been unable to change the assessment for the first two years that the Real Property was listed as exempt. The second is that such corrections can be made only where the property has not been sold or otherwise transferred after the error was made. In this case, the Real Property was mortgaged to MNB after and in partial reliance on the alleged error. If the granting of a mortgage constitutes a "sale" or other "transfer" under 79–1701a, the correction could not be made under that statute.

■ Neither 79–1701 nor 79–1701a define "sale" or "transfer." However, a Kansas rule of statutory construction, K.S.A. 1992 Supp. 77–201, *Second,* provides, "Words and phrases shall be construed according to the context and the approved usage of the language, but tech-nical words and phrases, and other words and phrases that have acquired a peculiar and appropriate meaning in law, shall be construed according to their peculiar and appropriate meanings." In several areas, Kansas law treats a mortgage as a purchase (and so also as a sale) or transfer. The Kansas statutes governing the recording of instruments affecting real estate, K.S.A. 58–2221 through –2223, indicate a mortgage is a "purchase" for purposes of such recording. In *Farmers & Merchants State Bank v. Higgins,* 149 Kan. 783, 784–88, 89 P.2d 916 (1939), the Kansas Supreme Court held that a bank which took a mortgage for an antecedent debt in return for extending the due date on the debt was a purchaser for a valuable consideration, and since the bank had no notice, its mortgage had priority over a previously executed but subsequently recorded deed. The Kansas Uniform Commercial Code declares that "purchase" includes taking by lien, mortgage and pledge. *See K.S.A. 1992 Supp 84–1–201(32).* The leading legal dictionary defines "transfer" as, among other things, "The sale and every other method, direct or indirect, of disposing of or parting with property or with an interest therein, or with the possession thereof, or of fixing a lien upon property or upon an interest therein, ... as a ... pledge, mortgage, lien, encumbrance, gift, security or otherwise." *Black's Law Dictionary 1342 (5th Ed.1979).* The Bankruptcy Code, of course, defines "transfer" very broadly, clearly including giving a mortgage within its meaning. *11 U.S.C.A. § 101(54).*[2] Based on all these "peculiar and appropriate meaning[s] in law" for "transfer" and "purchase" (or "sale"), the Court concludes that the mortgage to MNB was either a "sale" or other "transfer" under the last sentence of 79–1701a. Consequently, even under the broader interpretation of the word "understated" in 79–1701(h), the County had no authority to issue the corrected assessments or tax bills it sent the debtor, and thus has no claim against the Real Property for the taxes it alleges are due.

---

**2.** Due to a Congressional drafting error, two subsections of § 101 are number (54). This one should probably be (58).

For these reasons, the Court concludes the County had no authority under 79-1475, –1701 or –1701a to impose these taxes on the Real Property when it did. In the alternative, if the County could otherwise have imposed the taxes at that time, the mortgage to MNB cut off that authority. Consequently, MNB's motion should be granted. A separate judgment will be entered awarding the Disputed Tax Account Funds, $330,423.51, to MNB.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.